**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STEWART SMITH; FRED HEIDARPOUR, Individually and on behalf of all others similarly situated, <br><br>      Plaintiffs, <br><br>   v. <br><br> VISION SOLAR, LLC, and DOES 1 through 10, inclusive, and each of them, <br><br>      Defendants. | Case No.: 20-cv-2185 MMB |

**DEFENDANT VISION SOLAR, LLC'S SUPPLEMENTAL BRIEF IN SUPPORT OF
ITS MOTION TO STRIKE THE EXPERT REPORT OF JEFFREY A. HANSEN**

**FOX ROTHSCHILD LLP**
Colin D. Dougherty
10 Sentry Parkway
Suite 200, P.O. Box 3001, Blue Bell, PA 19422
Telephone: (610) 397-6500
Fax: (610) 397-0450
cdougherty@foxrothschild.com

Brett A. Berman
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
Telephone: (215) 299-2842
Fax: (215) 299-2150
bberman@foxrothschild.com

*Attorneys for Defendant Vision Solar LLC*

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................. 1

II.  LEGAL ARGUMENT........................................................................................... 1

  A.  There is No Evidence An Autodialer Was Used In This Case. ............................ 1

    1.  The Essential Features of an Autodialer under *Duguid v. Facebook*. ........ 1

    2.  Plaintiffs Have Failed to Demonstrate the Use of an Autodialer................ 2

      i.  The Testimony of Stewart Smith .................................................... 2

      ii.  The Testimony of Jeffrey Hansen ................................................... 3

  B.  Plaintiffs Cannot Establish That Solar Exchange Was An Agent of
      Defendant. ........................................................................................................... 7

    1.  Solar Exchange Was Not Acting as an Agent of Vision Solar As to
        the Calls Allegedly Received By Plaintiffs. ................................................ 8

    2.  There Is No Evidence That The Millions of Calls Allegedly Placed by
        Solar Exchange were for the Benefit of Vision Solar............................... 11

  C.  Other District Courts, Including This Court, Have Stricken Hansen's
      Testimony As Unreliable and This Court Should Again Reach That
      Conclusion. ....................................................................................................... 12

III.  CONCLUSION................................................................................................... 15

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allan v. Pa. Higher Educ. Assistance Agency*,
  968 F.3d 567 (6th Cir. 2020) ...................................................1

*Barry v. Ally Fin., Inc.*,
  No. 20-12378, 2021 WL 2936636 (E.D. Mich. July 13, 2021) ................6

*Borden v. eFinancial, LLC*,
  2021 WL 3602479 (W.D.Wash. August 13, 2021) ..........................6

*Castle Cheese, Inc. v. MS Produce, Inc.*,
  2008 WL 4372856 (W.D. Pa. Sept. 19, 2008)................................8

*Covington v. Int'l Ass'n of Approved Basketball Officials*,
  710 F.3d 114 (3d Cir. 2013)....................................................9

*Cunningham v. Cap. Advance Sols., LLC*,
  Civil Action No. 17-13050 (FLW), 2018 U.S. Dist. LEXIS 197590, 2018 WL
  6061405 (D.N.J. Nov. 20, 2018)..............................................7

*In re Dish Network, LLC*,
  28 FCC Rcd. 6574 (F.C.C. 2013) ......................................7, 9, 10

*Dominguez v. Yahoo!, Inc.*,
  No. CV 13-1887, 2017 WL 390267 (E.D. Pa. Jan. 27, 2017), *aff'd sub nom.*
  *Dominguez on Behalf of Himself v. Yahoo, Inc.,* 894 F.3d 116 (3d Cir. 2018) ................12, 13

*Duguid v. Facebook, Inc.,*
  926 F.3d 1146 (2019)...........................................................1

*Duran v. La Boom Disco, Inc.*,
  955 F.3d 279 (2d Cir. 2020)....................................................1

*Facebook, Inc. v. Duguid*,
  141 S. Ct. 1163 (2021)................................................... *passim*

*Hufnus v. DoNotPay, Inc.*,
  No. 20-CV-08701-VC, 2021 WL 2585488 (N.D. Cal. June 24, 2021) ...................6

*Keyes v. Ocwen Loan Servicing*,
  LLC, 335 F. Supp. 3d 951 (E.D. Mich. 2018) ..............................12, 14

*Klein v. Com. Energy, Inc.*,
  256 F. Supp. 3d 563 (W.D. Pa. 2017)........................................7

*Landy v. Nat. Power Sources, LLC*,
    No. 3:21-CV-00425, 2021 WL 3634162 (D.N.J. Aug. 17, 2021) ............................................7

*Luster v. Green Tree Servicing, LLC*,
    No. 1:14-CV-01763-ELR, Doc. No. 153 (N.D. Ga. Sept. 5, 2018)........................................12

*Mohamed v. Am. Motor Co., LLC*,
    No. 15-23352-CIV, 2017 WL 4310757 (S.D. Fla. Sept. 28, 2017).................................12, 13

*Timms v. USAA Fed. Sav. Bank*,
    543 F. Supp. 3d 294 (D.S.C. 2021).................................................................................5, 6, 15

**Statutes**

Telephone Consumer Protection Act 47 U.S.C. § 227 ........................................................ *passim*

**Other Authorities**

Fed.R.E. 704 ........................................................................................................................................4

Restatement (Third) of Agency § 1.01 (2006) ................................................................................8

I.      **INTRODUCTION**

In accordance with the additional briefing ordered by the Court, *see* ECF Nos. 49, 50,

Defendant Vision Solar addresses the Court's questions, in order, as follows:

II.     **LEGAL ARGUMENT**

    A.      **There is No Evidence An Autodialer Was Used In This Case.**

        1.      **The Essential Features of an Autodialer under *Duguid v. Facebook*.**

To state a claim under 47 U.S.C. § 227(b)(1)(A), a plaintiff must plausibly allege that "(1)

the defendant called a cellular telephone number; (2) using an automatic telephone dialing system;

(3) without the recipient's prior express consent."  Before *Duguid*, the Ninth, Second, and Sixth

Circuits had held that a system qualified as an automatic telephone dialing system ("autodialer" or

"ATDS")[1] if it had the capacity to store phone numbers to be called and to dial such numbers

automatically; it did not need to have the capacity to use a random or sequential number generator

to generate the phone numbers in the first instance. *See Facebook, Inc. v. Duguid*, 141 S. Ct. 1163,

at 1169 (2021) n.2.[2]

The Supreme Court reversed *Duguid I* and held that a system must store numbers using a

random or sequential number generator or produce numbers using a random or sequential number

generator to qualify as an ATDS. *Id*. at 1169 ("Because Facebook's notification system neither

stores nor produces numbers 'using a random or sequential number generator,' it is not an

autodialer.").   The Court defined an ATDS narrowly, explaining that Congress intended

---

[1]      Different courts have referred to an automatic telephone dialing system as either an "autodialer" or "ATDS" and they both related to the same definition under 47 U.S.C. § 227(b)(1)(A) and are interchangeable.

[2]      *Duguid* overruled the Ninth Circuit in *Duguid I*, 926 F.3d 1146 (2019); the Second Circuit in *Duran v. La Boom Disco, Inc*., 955 F.3d 279, 290 (2d Cir. 2020); and the Sixth Circuit in *Allan v. Pa. Higher Educ. Assistance Agency*, 968 F.3d 567 (6th Cir. 2020)

§227(b)(1)(A) to address the unique problems caused when companies used technology to dial random or sequential blocks of telephone numbers automatically.  The Supreme Court explained:

> Congress found autodialer technology to be uniquely harmful. It threatened public safety by "seizing the telephone lines of public emergency services, dangerously preventing those lines from being utilized to receive calls from those needing emergency services." ... Indeed, due to the sequential manner in which they could generate numbers, autodialers could simultaneously tie up all the lines of any business with sequentially numbered phone lines.

*Id*. at 1167 (*quoting* H.R. Rep. No. 102-317, p.24 (1991) (internal citations omitted)).

Thus, "[e]xpanding the definition of an autodialer to encompass any equipment that merely stores and dials telephone numbers would take a chainsaw to these nuanced problems when Congress meant to use a scalpel." *Id.* at 1171; *see also id.* at 1172 ("That Congress was broadly concerned about intrusive telemarketing practices…does not mean it adopted a broad autodialer definition. Congress expressly found that the use of random or sequential number generator technology caused unique problems for business, emergency, and cellular lines." (internal citations omitted).)  As such, the Supreme Court held "that a necessary feature of an autodialer under § 227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called."  *Id.* at 1173.  Here, there is no evidence that the technology allegedly used by Solar Exchange qualifies as an autodialer under the narrow definition in *Duguid*.

### 2.    Plaintiffs Have Failed to Demonstrate the Use of an Autodialer.

#### i.    *The Testimony of Stewart Smith*

Plaintiffs bear the burden of proving that the system that allegedly placed calls to Stewart Smith stored or produced numbers using a random or sequential number generator.  In support of this, Stewart Smith testified to receiving calls in which he heard a "click and a delay" before a live representative joined the call.  *See* Transcript of March 1, 2022 hearing ("Tr."), 34:24.  Based upon

this click or delay, Smith concluded that the system that placed the call was an "automatic dialer." *See* Tr., 35:10-11 ("Q: why is there a delay?  A: Because its an automatic dialer.").[3]

Notably absent from Smith's Original Complaint, or his First Amended Complaint, was any mention of his hearing a click or delay during any call.  *See* ECF Nos. 1, 2.  Indeed, Smith did not record the alleged offending call, took no notes during the call, did not document that he heard a click or delay, and relied solely upon his memory of the alleged calls from two years ago.  *See* Tr. at 47:4-16.  Beyond Smith's memory of a "click or delay", Plaintiffs offer only the opinion of Jeffrey Hansen.

### ii.    *The Testimony of Jeffrey Hansen*

Hansen's opinion does not support that an autodialer was used in this case.  First, Hansen **did not** opine that the system that was used to place the calls at issue qualified as an autodialer under *Duguid.*  Tr. 90:1-6.  On September 17, 2021, two weeks before serving Hansen's report, Plaintiff submitted their "Expert Witness Disclosure".  A true and correct copy of said disclosure is attached as Exhibit 1.  In ¶3 of the Expert Disclosure, Plaintiffs stated "Mr. Hansen is expected to opine that the software and equipment used by Solar Xchange LLC...otherwise qualifies as an ATDS, as defined by § 227(a)(1) of the TCPA."  *See* Ex. 1.  Yet, when asked during the hearing whether the technology at issued qualified as an autodialer, Hansen declined to reach that conclusion.  He stated:

---

[3]      Plaintiffs' expert, Jeffrey Hansen, did not reach this conclusion.  He stated only the click or delay that Smith described was likely from a "predictive dialer."  Tr. 97:17 ("A click or pause is suggestive of a predictive dialer."  For the reasons explained herein, a "predictive dialer" is not an autodialer under *Duguid* unless it can store or produce numbers using a random or sequential number generator.  As such, neither Smith nor Hansen can conclusion that merely hearing a "click or delay" supports the conclusion of autodialer use.

```
1  Q.   And you're saying the software in this case was an
2  automatic telephone dialing system; is that right?
3  A.   Well, I'm saying that it's a predictive dialer, and I know
4  that -- I think most of us are aware that there's been a lot of
5  argument of what that definition is, the ATDS definition.  I'm
6  not -- I'm not going to make an opinion on that.
```

Tr. 90:1-6.

When the Court asked Hansen whether his report provided an opinion regarding autodialer use, he stated "I was not attempting to make a legal opinion on that…" Tr., 94:7-12.  Hansen was familiar with the *Duguid* case and the Supreme Court's definition of an autodialer, Tr. 94:3-6, the rules of evidence allowed him to testify to the ultimate issue, *see* Fed.R.E. 704, Plaintiff expected him to conclude that the system at issue was an autodialer, *see* Ex. 1, ¶3, and Hansen has made such conclusions in other cases. *See* Hansen's Report in *Harold Allen, v. First National Bank Of Omaha,* 2019 WL 6457490 (M.D.Pa.), ¶28 (opining that "thus, in my expert opinion, the dialing system (as outlined above) has the characteristics of an ATDS as contemplated by the TCPA.").[4] Yet, he declined to conclude the system at issue here was an autodialer.  Had Hansen believed the system at issue here met the autodialer definition under *Duguid,* he would have so stated.  The only plausible conclusion is that Hansen does not believe, under *Duguid*, the system used by Solar Exchange used a number generator to store or produce phone numbers randomly or sequentially.

Second, Hansen's opinion that the system used was a "predictive dialer" is not evidence that the system would meet the narrow definition of an autodialer under *Duguid*.  For example, Hansen testified that the use of the "Aspect" predictive dialer, one of the most popular on the

---

[4]      Defendant also moved to exclude Hansen's report in *Harold Allen, v. First National Bank Of Omaha,* but the case settled and/or was dismissed by the court prior to the *Daubert* hearing and defendant's motion to exclude Hansen's testimony was dismissed as moot.

market, would not necessarily violate of the TCPA. Tr. 92:8-14.  Recently, in *Timms v. USAA Fed. Sav. Bank*, 543 F. Supp. 3d 294, 299 (D.S.C. 2021), the district court concluded the Aspect predictive dialer did not meet the definition of an autodialer.  *See id.* ("The court already rejected the argument that the predictive mode operates as an ATDS.").  In *Timms,* the predictive dialer at issue automatically dialed numbers from a pre-loaded list, just as Hansen acknowldges here. Applying *Duguid,* the district court granted summary judgment in favor of defendant, reasoning as follows:

> As we learned from Duguid, the automatic dialing capability alone is not enough to qualify a system as an ATDS. The system at issue must store numbers using a random or sequential number generator or produce numbers using a random or sequential number generator to qualify as an ATDS…[T]he fact that the Aspect UIP can automatically dial numbers on a preset list based on the number of agents available is not evidence that the Aspect UIP stores or produces telephone numbers using a random or sequential number generator. This argument is nothing more than a rehash of the now-rejected Ninth Circuit conclusion that to qualify as an ATDS, a system "need only have the capacity to 'store numbers to be called' and 'to dial such numbers automatically.'"  Just as the Supreme Court rejected the conclusion in Duguid, this court must reject it here.

*Timms,* 543 F. Supp. 3d at 299 (internal citations and quotations omitted).

Third, Hansen's description of the functionality of the dialer in this case does not fall within the narrow definition of an autodialer under *Duguid.*  Hansen opined that the entity that placed the calls did so by first uploading a global list of phone numbers to be called into the system.  Tr. 94:17-20 ("Phone numbers are initially statically stored on a hard drive…that's the global list"). Hansen further testified that to make the calls, the predictive dialer would "read[] that list sequentially" and call sequentially, or "randomize the list on the calling portion of that." Tr. 94:23-25.  Here, there was no testimony that the system stored numbers using a random or sequential number generator—rather, it stored a list of numbers "statically" on a hard drive.  There was similarly no testimony that the system produced numbers randomly or sequentially—rather, it merely determined the order of the numbers already present on the global list.

District courts applying *Duguid* are in accord that a system that randomly or sequentially **determines the order** in which to dial numbers from a list of stored numbers does not constitute an autodialer.  *See Barry v. Ally Fin., Inc.,* No. 20-12378, 2021 WL 2936636, at *6 (E.D. Mich. July 13, 2021) (a system "us[ing] a random number generator to determine the order it called Plaintiff's number" did not qualify as an ATDS) (emphasis added*); Hufnus v. DoNotPay, Inc.,* No. 20-CV-08701-VC, 2021 WL 2585488, at *1 (N.D. Cal. June 24, 2021) (a system "us[ing] a random number generator *to* determine the order in which to pick from the preproduced list of consumer phone numbers" was not an ATDS); *Timms,* 2021 WL 2354931 (D.S.C. June 9, 2021); *Borden v. eFinancial, LLC,* 2021 WL 3602479 at *3 (W.D.Wash. August 13, 2021) (a system that "uses a sequential number generator to [] determine the order in which to pick phone numbers to be dialed from a stored list or database of phone numbers" did not qualify as an ATDS).

Here, Hansen opines that the system at issue automatically dialed calls from a static list which was preloaded onto a hard drive.  The systems ability to randomly or sequentially **determine the order** of the numbers to call from the static list does not support the autodialer definition. Based upon Supreme Court's narrow definition of an autodialer in *Duguid,* and the district court decisions in *Barry, Hufnus, Timms,* and *Borden* applying that definition, the system described by Hansen would not qualify as an autodialer.  The Supreme Court in *Duguid* plainly held that "a necessary feature of an autodialer under § 227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce numbers to be called." 141 S. Ct. at 1173. There is no evidence that the system in this case would meet that criteria.

6

### B.   Plaintiffs Cannot Establish That Solar Exchange Was An Agent of Defendant.

Vision Solar does not engage in any direct marketing to consumers.  Benko Dep. at, 12:11-13.[5]  Vision Solar purchases appointments for home solar installation from outside firms.  *Id.*  Plaintiffs do not allege Vision Solar placed a single call that violated the TCPA.  Under Plaintiffs' theory of liability, Vision Solar is vicariously liable for the calling practices of third-party lead generation companies that sold pre-scheduled appointments to Vision Solar, specifically, Solar Exchange.  However, "[a]n entity cannot be held liable under the TCPA 'merely because they stand to benefit from the call.'" *See Landy v. Nat. Power Sources, LLC,* No. 3:21-CV-00425, 2021 WL 3634162, at *3 (D.N.J. Aug. 17, 2021); *quoting In re Dish Network, LLC*, 28 FCC Rcd. 6574, 6593 (F.C.C. 2013).

Plaintiffs' putative class action is based upon a theory that Vision Solar should be held vicariously liable for every call placed by Solar Exchange.  In the Third Circuit, a defendant that is not the initial caller may be held vicariously liable under the TCPA based upon common law agency principles. *Klein v. Com. Energy, Inc.*, 256 F. Supp. 3d 563, 584 (W.D. Pa. 2017). As such, to establish liability in their individual claims, Smith and Heidarpour must establish the calling party acted through the actual authority, apparent authority, or ratification of Vision Solar. *Cunningham v. Cap. Advance Sols., LLC*, Civil Action No. 17-13050 (FLW), 2018 U.S. Dist. LEXIS 197590, at *6, 2018 WL 6061405 (D.N.J. Nov. 20, 2018).  For the reasons explained below, there was not an agency relationship between Defendant and Solar Exchange.  However,

---

[5]      The citation "Benko Dep." Refers to the transcript of the deposition of Vision Solar's corporate designees, Ryan Benko, which occurred on June 30, 2021.

even if there were such a relationship as to calls for Smith and Heidarpour individually, that relationship cannot be applied generally to millions of calls that are not associated with Defendant.

### 1. Solar Exchange Was Not Acting as an Agent of Vision Solar As to the Calls Allegedly Received By Plaintiffs.

Vision Solar had no authority, perceived or actual, to control Solar Exchange. *Castle Cheese, Inc. v. MS Produce, Inc.*, 2008 WL 4372856, at *8 (W.D. Pa. Sept. 19, 2008) (The "principal's right to control the actions of the agent is a hallmark of an agency relationship."); *see also* Restatement (Third) of Agency § 1.01 (2006) ( "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control…."). The relationship between Defendant and Solar Exchange was governed by what appears to be a standard agreement drafted by Solar Exchange with Defendant as its customer. A true and correct Copy of the Agreement is attached hereto as Exhibit 2. The Agreement provides that:

> Solar Exchange LLC…desires to provide Customer [Vision Solar] with exclusive access to Appointment information. For purposes of this contract, "Appointments(s)", represents all qualified products as set forth on the Purchase order…Solar Exchange LLC agrees to use commercially reasonable efforts to provide the Appointments specified in the Purchase Order…Solar Exchange LLC does not guarantee that any minimum quantity of Appointments will be provided.

*See* Ex. 2, as "Terms and Conditions".

Pursuant to the Agreement, Solar Exchange had complete control over the means by which it would obtain appointments, and could have done so by email, text message, publication, phone call, or **any** commercially reasonable means. *See* Ex. 2. Vision Solar had no control over the direct marketing efforts undertaken by Solar Exchange. Under the Agreement, Solar Exchange does not allow Vision Solar to control the timing, quantity, and or geographic location of said calls, nor write a calling script. Further, while the home solar appointments purchased by Vision Solar are "exclusive" in that Solar Exchange could not sell appointments to other entities, there is nothing

in the Agreement that would prevent Solar Exchange from engaging in direct marketing calls on behalf of other entities, including other home solar providers.[6]  Solar Exchange had no actual authority to act on behalf of Vision Solar and therefore no agency relationship exists under this theory.

Plaintiffs have not established that Solar Exchange possessed any apparent authority to act on behalf of Vision Solar.  "Apparent authority arises in those situations where the principal causes persons with whom the agent deals to reasonably believe that the agent has authority despite the absence of an actual agency relationship." *See Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 120 (3d Cir. 2013) (citation and quotations omitted). The Federal Communications Commission ("FCC") identified the hallmarks of an apparent authority relationship in the context of the TCPA in *In re Dish Network,* 28 FCC Rcd. at 6592, and provided as follows:

> Apparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information.... It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts.

*See id.*

Here, there is no evidence that Vision Solar provided any details regarding pricing, or the specific products or services offered to Solar Exchange.  Plaintiffs recall only generic information about lowering their electric bill and their interest in home solar.  *See* Tr. 33:9-11 (Smith stated, "They called and asked if you want to lower my electric bills, come out and do -- come out to the house and do a free consultation and can we see your electric bill."). There is similarly no evidence that

---

[6]     For example, regarding the volume of home solar direct marketing calls, Fred Heidarpour testified to receiving approximately 30 calls per day, 90% of which are telemarketers trying to sell solar energy services and/or home solar services. *See* Tr. 19:7-10.  Nothing in the Agreement would prevent Solar Exchange from placing millions of telemarketing calls on behalf of other entities that are unrelated to Vision Solar.

Vision Solar wrote, reviewed, or approved telemarketing scripts. Indeed, to avoid any doubt that Solar Exchange possessed no apparent authority to act on its behalf, Vision Solar did not authorize the use of its trade name. *See* Benko Dep. at, 51:24. Both Smith and Heidarpour admitted that Solar Exchange did not mention the name Vision Solar during the calls. *See* Tr. 27:4-6, 37:24 – 38:1. As such, there is nothing in the content of the calls that would demonstrate the caller possessed the apparent authority to act on behalf of Vision Solar.

Finally, Plaintiffs have failed to demonstrate that Vision Solar ratified the acts of Solar Exchange that allegedly violated the TCPA. First, as set forth above, the evidence does not support Solar Exchange's use of an autodialer as defined by *Duguid*. Second, Vision Solar had no reason to believe Solar Exchange was engaging in any practice that violated the TCPA. In *Dish Network supra,* the FCC stated that:

> [A] seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

28 FCC Rcd. at 6592.

There is no evidence Vision Solar authorized the use of an autodialer or prerecorded voice. On the contrary, Vision Solar required outside vendors comply with the TCPA. Benko Dep. at, 36:3. Solar Exchange provided Vision Solar with written assurances that it fully complied with the TCPA, which Vision Solar justifiably relied upon. The letter from Solar Exchange is attached hereto as Exhibit 3. Vision Solar was never notified that that Solar Exchange placed any calls that violated the TCPA, or otherwise should have known that any call placed by Solar Exchange violated the TCPA. Vision Solar never ratified the use of an autodialer or pre-recorded and cannot be held vicariously liable for the unauthorized actions of Solar Exchange.

    2.      **There Is No Evidence That The Millions of Calls Allegedly Placed by Solar Exchange were for the Benefit of Vision Solar.**

Even if this Court were to conclude that an agency relationship existed with respect to the calls received by Plaintiffs, the evidence establishing that relationship is not shared with other putative class members.  Plaintiffs' putative class is based upon the baseless assumption that the 117 million calls placed by Solar Exchange were **all** made for the benefit of Vision Solar.  However, the Agreement between Solar Exchange and Vision Solar does not support that conclusion.

The Agreement provides that Solar Exchange "desire[d] to provide Customer [Vision Solar] with exclusive access to **Appointment information**."  *See* Ex. 1, (emphasis added).  Nothing in the Agreement stated that Vision Solar was its only customer.  Indeed, the Agreement suggests that Solar Exchange had other customers: Solar Exchange's logo is featured on the Agreement showing it is their creation; the Agreement is a form agreement with standard terms easily adaptable to other customers; the box for "customer name" is Vision Solar and is otherwise referred to throughout the Agreement simply as "Customer."  *See* Ex. 2.

There is nothing in the Agreement that would, in any way, place limitations on Solar Exchange's ability to place millions of telemarketing calls on behalf of other entities to solicit their products or services.  The spreadsheets Hansen reviewed do not state on whose behalf the millions of calls were placed, and he did not, because he could not, offer an opinion that all the calls on the spreadsheets were placed for Vision Solar's benefit.  Indeed, Vision Solar does not require outside firms to exclusively provide services to Vision Solar.  Benko Dep. at, 66:7-25.  Plaintiffs rely upon speculation and conjecture for the unsupported assumption that that all calls placed by Solar Exchange were for the benefit of Vision Solar.

Plaintiffs asks this Court to certify a class of millions of induvials who may have received calls from Solar Exchange that were completely unrelated to Vision Solar.  Should this Court determine an agency relationship existed between Solar Exchange and Vision Solar, the factual basis upon which that relationship rests—that a Vision Solar representative attended a home solar appointment within days or weeks of receiving a call from Solar Exchange—does not apply generally to all members of the putative class.  As such, Plaintiffs cannot establish the agency relationship necessary for class certification and certification should be denied.

### C.    Courts Have Stricken Hansen's Testimony As Unreliable.

In support of Plaintiffs' assertions that Solar Exchange used an autodialer, Plaintiffs rely upon the expert opinion of Jeffrey Hansen.  On his *curriculum vitae* ("CV"), Hansen identifies 290 civil matters in which he "ha[s] been called to testify."  A true and correct copy of Hanson's CV is attached hereto as Exhibit 4.  However, in several of these cases where Hansen allegedly testified, his testimony or opinion was stricken by the Court.  *See Dominguez v. Yahoo!, Inc.*, No. CV 13-1887, 2017 WL 390267, at *19 (E.D. Pa. Jan. 27, 2017), *aff'd sub nom. Dominguez on Behalf of Himself v. Yahoo, Inc.,* 894 F.3d 116 (3d Cir. 2018) (No. 30 on Hansen's CV); *see also Luster v. Green Tree Servicing, LLC*, No. 1:14-CV-01763-ELR, Doc. No. 153 (N.D. Ga. Sept. 5, 2018) (No. 55 on Hansen's CV), a copy of *Luster* is attached hereto as Exhibit 5.  Additionally, Hansen omits from his CV at least two other cases in which his testimony and/or opinion was stricken.  *See in Keyes v. Ocwen Loan Servicing,* LLC, 335 F. Supp. 3d 951 (E.D. Mich. 2018), dismissed upon parties' stipulation, No. 18-1989, 2018 WL 6242281 (6th Cir. Oct. 24, 2018); *Mohamed v. Am. Motor Co., LLC*, No. 15-23352-CIV, 2017 WL 4310757, at *1 (S.D. Fla. Sept. 28, 2017).  Hansen's testimony and/or opinions were stricken for multiple reasons, each of which apply here.

In *Dominguez v. Yahoo!, Inc.*, No. CV 13-1887, 2017 WL 390267, at *19 (E.D. Pa. Jan. 27, 2017), *aff'd sub nom. Dominguez on Behalf of Himself v. Yahoo, Inc.,* 894 F.3d 116 (3d Cir. 2018), this Court concluded that Hansen testimony would be unhelpful to a jury because it failed to provide a frame of reference through which the jury could weigh the evidence to determine autodialer functionality.  The court provided the following reasoning:

> A trier of fact is well-equipped to decide the weight to afford to expert testimony in the context of a vehicular accident because they can assess all evidence (including each parties' testimony, any other witness testimony, photos of the accident, et cetera) in the context of their own experience.
>
> This case is different. Here, the trier of fact would be asked to determine whether a computer program had the capacity to perform a particular function. This is much more technical, and is akin to showing that an alternative design of a product would be safer in a products case. Plaintiff's experts provide no frame of reference through which the jury could weigh the evidence and assess whether Yahoo's Email SMS Service had the capacity to generate and dial random numbers. Rather, the jury would be left only with the experts' conclusions versus Yahoo's contrary assertion. Essentially, the Court holds that the expert reports as they stand now, without any way to test their hypotheses, would be unhelpful to a jury asked to assess liability in this case. As the Third Circuit has held, helpfulness is the hallmark of admissibility determinations under Daubert.

*See Dominguez,* 2017 WL 390267, at *19.

Other courts have stricken Hansen's testimony based upon its lack of reliability. In *Mohamed v. Am. Motor Co., LLC*, No. 15-23352-CIV, 2017 WL 4310757, at *4 (S.D. Fla. Sept. 28, 2017), a copy of which is attached as Exhibit 6, the court determined Hansen did not review sufficient information to form his conclusions regarding the capabilities of the software at issue. The court granted defendant's motion to exclude Hansen's report, supplemental report, and testimony, based upon the following reasoning:

> Hansen did not test or use the software in any way, the Twilio discovery responses he reviewed were vague and highly non-technical, as were ICO's discovery responses, and one of the two Youtube videos he relied upon was not a Twilio approved video. It does not appear that Mr. Hansen followed his own normal, rather extensive, methodology in forming his opinion in this case….Allowing Mr. Hansen's expert report or testimony before the jury would be contrary to the standards of reliability required under the Federal Rules of Evidence and the Daubert standard.

*Mohamed,* 2017 WL 4310757, at *4 (internal quotations and citations omitted).

In *Keyes v. Ocwen Loan Servicing, LLC*, a copy of which is attached hereto as Exhibit 7, the district court similarly concluded that Hansen had not reviewed sufficient information, inspection, or tested the relevant equipment to form his opinions regarding autodialer functionality. 335 F. Supp. 3d 951, (E.D. Mich. 2018), *dismissed,* No. 18-1989, 2018 WL 6242281 (6th Cir. Oct. 24, 2018).   The district court granted defendant's motion to exclude Hansen's report, because his report was based on insufficient facts or data and therefore unreliable.   The district court explained:

> Here, there is no indication that Hansen has ever tested or inspected an Aspect system, let alone the Aspect System which Ocwen used to call Keyes. Keyes asserts, however, that Hansen has 'analyzed the Aspect UIP predictive dialer in other matters numerous times over the last 10 years.  Specifically, Keyes highlights two cases in which Hansen supposedly analyzed the Aspect System that Ocwen used…[b]ut Keyes's reliance on those cases is misplaced. Hansen did not inspect or test Ocwen's Aspect System in those matters… Hansen's report lacks an adequate factual basis because, like the experts whose testimony was excluded in the cases noted above, Hansen has not tested the relevant equipment. Indeed, in drafting his report, Hansen simply reviewed documents and manuals regarding (1) predictive dialers and automatic telephone dialing systems ("ATDSs"), and (2) the Aspect System generally. As such, Hansen did not test his theory regarding how Ocwen places calls through Aspect, as required by *Daubert*. And his involvement and analysis of an Aspect system in other litigations does not establish that testability exists here.
>
> No evidence in the record indicates that Hansen has tested or inspected the Aspect System which Ocwen called Keyes from, or that Hansen has reviewed any patents which detail the specifications for how Ocwen uses the Aspect System to make calls. As a result, Hansen's report is "unsupported speculation" and a "mere guess" regarding how Ocwen uses the Aspect System. His report, then, is insufficient under Daubert. There is "simply too great an analytical gap between the data and the opinion proffered" by Hansen, making his report simply the "ipse dixit" of an expert.

*See id.,* at 957-58. (internal quotations and citations omitted).

Here, Hansen reviewed only call detail records.   He did not test the system or software Solar Exchange allegedly used to place the calls at issue, he never observed the system being used, did not review manuals or user guides, he cannot identify the make or model of the software used, and cannot confirm past experience using or analyzing the functionality of the unknown system or software.   At bottom, Hansen merely reviewed columns in a spreadsheet, specifically the "outbound" column and the "disposition" column, and concluded that the software used was a "predictive dialer."  *See* Tr. 69:15 – 71:23.

14

Whether or not the software used by Solar Exchange was a "predictive dialer" is not helpful to the trier of fact because it is not in any way related to the storage or production of numbers—the necessary features of an autodialer.  In *Allen v. First national Bank*, 3:18-CV-1216-RDM, (M.D.Pa.), Hansen authored a report dated April 18, 2019, which is attached hereto as Exhibit 8, Hansen explained that a predictive dialer that automatically dials completely unrelated to the storage and production of numbers to be called:

> A predictive dialer has the capacity of an ATDS, not because it predicatively dials calls, but simply because it has the capacity to automatically call numbers stored in a list. The predictive algorithm in a predictive dialer predicts when agents would be available and is no way related to the storage or production of numbers. **With all the predictive dialers that I have worked with in the last 18 years, the predictive algorithm was in no way related to the storage or production of numbers.**

*See* Ex. 8, ¶29 (emphasis added).

However, "[a]s we learned from *Duguid*, the automatic dialing capability alone is not enough to qualify a system as an ATDS." *Timms,* 543 F. Supp. 3d at 299.  Under *Duguid,* "a necessary feature of an autodialer under § 227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called." *Duguid*, 141 S. Ct. 1163, 1173, (2021).  Hansen's opinion that Solar Exchange used a "predictive dialer" in this case "is in no way relate[s] to the storage or production of numbers" and therefore has no bearing on whether or not the software used was an autodialer and should be stricken.

## III.    CONCLUSION

For all the foregoing reasons, Defendant Vision Solar, LLC requests this Honorable Court deny Plaintiff's motion for class certification and grant Defendant's Motion to Strike the expert report of Jeffrey Hansen.

Dated: <u>March 15, 2022</u>                    Respectfully submitted:

                                                 **FOX ROTHSCHILD LLP**

                                                 By: <u>/s/ Colin D. Dougherty</u>

Colin D. Dougherty
10 Sentry Parkway
Suite 200, P.O. Box 3001
Blue Bell, PA 19422
Telephone: (610) 397-6500
Fax: (610) 397-0450
cdougherty@foxrothschild.com

Brett A. Berman
2000 Market Street
20th Floor
Philadelphia, PA 19103-3222
Telephone: (215) 299-2842
Fax: (215) 299-2150
bberman@foxrothschild.com

*Attorneys for Defendant Vision Solar, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Colin D. Dougherty, hereby certify that, on this date, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by cooperation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of electronic filing. Parties may access this filing through the Court's CM/ECF System.


By: <u>/s/ Colin D. Dougherty</u>
      Colin D. Dougherty

Dated: March 15, 2022