UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STEWART SMITH; FRED HEIDARPOUR,** individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**VISION SOLAR, LLC, and DOES 1 through 10, inclusive, and each of them,**<br><br>Defendants. | Case No. **2:20-cv-02185-MMB** |

**PLAINTIFFS' SUPPLEMETAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CLASS CERTIFICATION**

**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
Thomas E. Wheeler (*pro hac vice*)
21031 Venture Blvd, Ste. 340
Woodland Hills, CA 91364
Phone: 866-598-5042
Fax: 866-633-0228
tfriedman@toddflaw.com
*Attorneys for Plaintiffs Stewart Smith, Fred Heidarpour, and the putative Classes*

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. THE CALL DETAIL RECORDS ................................................................................. 2

III. LEGAL ARGUMENT .................................................................................................. 5

    A. The Device Used By Solar Exchange To Call Smith Was An ATDS ................................ 7

    B. Smith and Heidarpour Were Called By Agents Of Defendant ............................................ 8

    C. Courts Have Found Mr. Hansen's Testimony Useful ....................................................... 11

IV. CONCLUSION ............................................................................................................ 13

## TABLE OF AUTHORITIES

**Cases**

*Booth v. Appstack, Inc.*, 2015 WL 1466247 (W.D. Wash. Mar. 30, 2015) .................................. 12

*Covington v. Int'l Ass'n of Approved Basketball Officials,* 710 F.3d 114 (3d Cir.2013) ................ 9

*Dobkin v. Enter. Fin. Grp., Inc.*, No. 2:14-CV-01989 WHW, 2014 WL 4354070 (D.N.J. Sept. 3, 2014) ................................................................................................................................... 10

*Dominguez v. Yahoo!, Inc.*, 2017 WL 390267 (E.D. Pa. Jan. 27, 2017) ...................................... 12

*Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021)................................................................. 2, 7, 8

*Gaines v. Law Office of Patenaude & Felix, A.P.C.*, 2014 WL 3894345 (S.D. Cal. July 2, 2014)12

*Hartley-Culp v. Green Tree Servicing, LLC*, 52 F. Supp. 3d 700 (M.D. Pa. 2014) ....................... 7

*Hawk Valley, Inc. v. Taylor*, 2014 WL 1302097 (E.D. Penn. Mar. 31, 2014)................................ 9

*Keyes v. Ocwen Loan Servicing*, LLC 2018 WL 3914707 (E.D. Mich. 2018).............................. 8

*Klein v. Com. Energy, Inc.*, 256 F. Supp. 3d 563 (W.D. Pa. 2017) ......................................... 9, 11

*Lofton v. Verizon Wireless (VAW) LLC*, 2015 U.S. Dist. LEXIS 34516 (N.D. Cal. Mar. 18, 2015) ..................................................................................................................................... 7

*Mey v. Venture Data, LLC*, No. 5:14-CV-123, 2017 WL 10398569 (N.D.W. Va. June 6, 2017)12, 13, 14

*Richardson v. Verde*, 2016 LEXIS 175642 (E.D. Pa, December 19, 2016) .................................. 9

*Strauss v. CBE Grp., Inc.,* 2016 WL 2641965  (S.D. Fla. Mar. 23, 2016) ............................. 12, 13

**Statutes**

Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* .................................................. 1, 6

**Other Authorities**

Restatement (Third) of Agency (2006) .................................................................................. 10, 11

**I.     INTRODUCTION**

As was noted in the filing of the original motion, this case is about accountability and whether Defendant Vision Solar LLC ("Defendant") can evade liability for its role in contracting with a company to bombard consumers with 117 <u>million</u> phone calls in one year to produce leads through shoddy record keeping.  Following Plaintiffs' Offer of Proof at the hearing on March 1, 2022, the Court ordered the Parties to address the underlying merits of the case—and not repeat any prior arguments.  Plaintiffs Stewart Smith ("Smith") and Fred Heidarpour ("Heidarpour") hereby submit this supplemental brief addressing how they have put forth substantial evidence to demonstrate that companies placing calls on behalf of Defendant violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA") by using either an automatic telephone dialing system ("ATDS") or prerecorded voice.[1]

Additionally, Defendant can be held liable through traditional agency principals for the conduct of its telemarketers under both direct agency and ratification. Defendant had an explicit contract with Solar Exchange LLC ("Solar Exchange") which called for the provision of appointments which were to be obtained through telemarketing.  Both Smith and Heidarpour experienced Defendant's business practice of having its vendors place telemarketing calls to setup an appointment at which Defendant's employee appears—as both Smith and Heidarpour had an employee of Defendant arrive at their house on a date setup by the telemarketers.  Defendant was explicitly aware that Smith was being called by individuals on its behalf when it received a letter complaining of the conduct in October 2019 and did nothing to prevent further such calls.

Finally, Plaintiffs have also attached a copy of an excerpt of 40 records from the Call Detail Records with headers in support of their Expert Jeff Hansen's ("Hansen") testimony.  These

---

[1] The Solar Exchange Class represented by Stewart concerns the use of an ATDS. The Prerecord Injunction Class represented by Heidarpour concerns the use of an artificial or prerecorded voice.

records reflect Mr. Hansen's testimony by examining just one single second of calls placed by Solar Exchange which resulted in one wrong number connection to an agent and 39 non-connects that were disposed of by the dialer before tying up an agent. These records augment the points raised by Mr. Hansen in his testimony and support his conclusion that based on the call detail audit records, the device used by Solar Exchange was a predictive dialer that used a random or sequential number generator and thus is an ATDS under *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021). Mr. Hansen is a recognized expert in this area and numerous Courts have found his testimony both relevant and reliable—and this Court should do so as well.

For the reasons set forth herein and in their original briefing, Plaintiffs respectfully request the Court certify this matter.

## II.     THE CALL DETAIL RECORDS

Plaintiffs attach to this supplemental memorandum as Exhibit 1 a sample of the Call Detail Records placed by Solar Exchange and as produced by Defendant in this matter. The Call Detail records are an audit of every call that was made by the dialer and how the system was used to place such call, and tracks information about each call, including the time, date, and disposition. Testimony of Jeffrey Hanson from Transcript of March 1, 2022 Hearing ("Hearing Trans.") at 56:2-5; 77:2-18. Each row is an individual call and each column is a particular datapoint for those calls. *Id.* at 59:2-8.

Mr. Hansen pulled 40 rows of data from DEF_000000001, which he noted was a good example.[2] *Id.* at 60:1-3. These rows correspond to 40 calls which were placed by Solar Exchange's dialer at exactly 11:19:14 a.m. on April 28, 2020. The columns provide headers for the data about each call which is stored in the row, including call type, disposition code, talk

---

[2] The Row # reflected in the first column was added by Mr. Hansen to indicate the row at which the data appeared in the original spreadsheet.

time, and agent. *Id.* at 56:2-5; 59:2-8.

Call Type indicates whether the call was inbound, outbound, or manual, with outbound indicating predictively dialed calls. *Id.* at 60:11-18. In this data set, all forty calls placed within one second are designated "outbound."

The duration and talk time columns indicate the length of the call and whether the call was answered. *Id.* at 65:24-25; 66:19-23. In the data set, only the call that was assigned to an agent has any talk time—indicating that only that call resulted in a live connection with an individual who was called. Additionally, excluding that call, the overwhelming majority of the remaining calls had a duration of 0:00, indicating that the call was not answered by anything, as compared to answering machine pickups which had variable lengths while the dialer detected the system before disconnecting.

The disposition column indicates the outcome of the call. *Id.* at 67:11-22. In the data set, this includes: "answering machine," indicating that the call was answered by an answering machine; busy, indicating the line was busy when called; no answer, indicating no one answered the call; abandon, indicating that the system abandoned the outbound call; operator intercept; hangup; and wrong number. *Id.* The only call which was answered and connected to an agent has the disposition code "wrong number," indicating that the individual reached stated that Solar Exchange did not have the right person it was trying to call.

The agent column reflects whether a live agent answered the calls, with each individual having a username and no entry when there is no agent. *Id.* at 63:14-22; 64:14-18. In the data set produced, only one of the calls was connected with an agent designated "s.morawski@solarxchange" with all others bearing no entry.

Putting all of these headers together, a predictive dialer will not assign an agent unless

3

there is a live answer, so a call that is not answered will have no talk time, a disposition code indicating it was not answered, and no agent assigned to it. *Id.* at 65:7-15; 70:25-71:6; 71:13-18. The data conforms to this hypothesis, as no call except the one that was answered had any talk time or an agent assigned. *Id.* at 59:2-8; 74:2-5. Instead, the remaining 39 calls started at 11:19:14 a.m. on April 28, 2020 resulted in phones ringing, with a majority resulting in no answer at all and the remainder being picked up by an answering machine or terminated by the dialer for running too long.

To look at one specific row in the data, the first row produced is as follows:

| Row # | DATE | TIME | DNIS | ANI | CALL TYPE | DURATION | TALK TIME | DISPOSITION | CAMPAIGN | AGENT |
|---|---|---|---|---|---|---|---|---|---|---|
| 70374 | 4/28/2020 | 11:19:14 | 407▮▮▮ | 8568613250 | Outbound | 0:00:04 | 0:00:00 | Answering Machine | Live Leads | [None] |

This data indicates that a call was placed on April 28, 2020 at 11:19:14 a.m. from (856) 861-3250[3] to a number beginning in 407.[4] *Id.* at 59:2-8. The call was placed by the dialer in "outbound" mode and lasted for four seconds before detecting an answering machine and disconnecting. No person was reached, such that Talk Time is zero and no agent was assigned. The record also reflects it was part of a campaign called Live Leads. The presence of campaigns is a hallmark of predictive dialers. *Id.* at 68:5-14.

The system functions in this way because a predictive dialer uses multiple lines per agent to optimize talk times, usually averaging three to five lines per agent with the anticipation that one out of every five or eight calls will result in a live response. *Id.* at 74:13-75:2. Mr. Hansen further noted that the usual response rate is around 10% when a dialer is calling both home and cellphones—with a higher rate of around 15% when calling only cellphones as compared to

---

[3] As an interesting note, Row #s 70381, 70382, 70396-70398, and 70412-70413 also reflect "spoofing," in which the dialer changes the caller ID used to place the call to have the same area code as the recipient of the calls—as indicated by the matching of the area codes for DNIS and ANI.
[4] The phone numbers for the individuals called are redacted to protect their privacy.

landlines where individuals are not home. *Id.* at 75:22-76:2. The data reflects the dialer placing calls at a rate of forty lines per agent (as there were 40 calls with just one agent assigned to an answer) and a response rate of 2.5% (1 answer / 40 calls). This reflects an aggressive dialing strategy by which the system is used to place many, many calls with a very low expected response rate which would be economically unfeasible in the absence of a predictive dialer—as otherwise forty agents would have to be placing forty calls as compared to just one. Based off the data as exemplified in the data set produced, Mr. Hansen is 100% confident the system used by Solar Exchange was a predictive dialer. *Id.* at 80:1.

A predictive dialer uses a random or sequential number generator to produce the numbers to be called and to then place those calls. *Id.* at 78:5-21; 94:11-24. The random or sequential number generation is necessary for how they function. *Id.* While Mr. Hansen did not want to testify as to a legal opinion[5] on whether the dialer used was an ATDS under *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), he did testify that the type of random or sequential number generation used by the dialer in this matter falls within the confines of an ATDS under *Duguid* and that the dialer used by Facebook was not a predictive dialer. *Id.* at 94:11-24; 95:2-5; 100:4-24.

**III.   LEGAL ARGUMENT**

Plaintiffs have submitted substantial evidence through the documents and testimony produced by Defendant, their own testimony which correlates directly with Defendant's business practices, and the testimony of Mr. Hansen in interpreting the Call Detail Records to demonstrate that Defendant's agents placed calls in violation of the TCPA.

In order for there to be a violation of the TCPA, there must be (1) a call placed to a

---

[5] Because Mr. Hansen's position, as has been reiterated by Courts in considering his reports, is that whether a device is an ATDS is a legal issue reserved for a judge which an expert cannot directly opine on.

telephone; (2) using an ATDS or an artificial or prerecorded voice; (3) without the prior express consent of the party called. 47 U.S.C. § 227(b)(1)(A) & (B). For ATDS calls, such as the one made to Stewart, this call must be made to a cellular telephone. 47 U.S.C. § 227(b)(1)(A)(iii). For prerecord calls, such as the one made to Heidarpour, the call may alternatively be made to a residential telephone line. 47 U.S.C. § 227(b)(1)(B).

In this matter, Defendant has not contested that Smith (or the proposed Solar Exchange Class) was called on his cellular telephone or that there was no consent for such calls to be made. Defendant has also not contested that Heidarpour was called on a residential telephone line with a prerecorded voice and that there was no consent for such calls to him either. Instead, Defendant's sole arguments rest on the issue of whether the device qualified as an automatic telephone dialing system[6] and whether Solar Exchange was acting as its agent in placing the calls to generate appointments. Defendant has presented no evidence to contradict Hansen's testimony that a random or sequential number generator was used to produce numbers to be dialed and then dialed those numbers. This falls exactly within the definition of an ATDS as promulgated by the Supreme Court in *Duguid*.

With respect to agency, common law agency principals apply to the determination of whether Defendant is responsible for the tortious actions of its agents. Courts across the county have followed the FCC ruling and held that sellers can be held vicariously liable for the unlawful telemarketing practices of their third-party contractors under the TCPA. *See Hartley-Culp v. Green Tree Servicing, LLC*, 52 F. Supp. 3d 700, 703 (M.D. Pa. 2014); *see also Lofton v. Verizon Wireless (VAW) LLC*, 2015 U.S. Dist. LEXIS 34516 (N.D. Cal. Mar. 18, 2015) ("Under the TCPA, a defendant may be held vicariously liable for calls it does not directly initiate 'under

---

[6] Which only matters to Smith's claims.

federal common law principles of agency.'"). Accordingly, Plaintiffs respectfully request the Court certify this matter as a class action.

### A. The Device Used By Solar Exchange To Call Smith Was An ATDS

The statutory definition of an ATDS was reset by the Supreme Court in the recent *Duguid* matter based on the plain text of the statute—but Mr. Hansen testified that the predictive dialer used to call Smith was used in a way that falls exactly within this plain language definition. In *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), the Supreme Court held that "[t]o qualify as an 'automatic telephone dialing system,' a device must have the capacity either to store a telephone number using a random or sequential generator ***or* to produce** a telephone number using a random or sequential number generator." (emphasis added). The Court further observed that "advances in automated technology made it feasible for companies to execute large-scale telemarketing campaigns at a fraction of the prior cost, dramatically increasing customer contacts. Infamously, the development of "robocall" technology allowed companies to make calls using artificial or prerecorded voices, obviating the need for live human callers altogether." *Id.* at 1167. The Court determined that the texting platform used by Facebook, which sent one-to-one text messages to individuals upon a triggering event, was not the type of technology targeted by Congress and presented real world problems of overbreadth because such systems "could affect ordinary cell phone owners in the course of commonplace usage, such as speed dialing or sending automated text message responses." *Id.* at 1171. However, the Court also referenced the possibility that "an autodialer might use a random number generator to determine the order in which to pick phone numbers from a pre-produced list. It would then store those numbers to be dialed at a later time." *Id.* at 1172 n.7.

Mr. Hansen provided his expert opinion that the predictive dialer used in this matter

**produced** the numbers to be dialed using a random or sequential number generator and then dialed those numbers either randomly or sequentially. Hearing Trans. 94:17-95:5. He multiply explained the nature of this functionality actually used by the predictive dialer. *Id.* at 78:6-79:9; 100:17-20. He also stated that the dialer in *Facebook* dismissed by the US Supreme Court bears no resemblance whatsoever to the dialer used here. *Id.* at 95:3-5. While Mr. Hansen would not opine on the ultimate "legal conclusion,"[7] as would be inappropriate for an expert, he stated that the facts demonstrate that the device at issue falls exactly within the terms defined by the Supreme Court in *Duguid*. Accordingly, Plaintiffs have presented substantial evidence that the device used by Solar Exchange to call Plaintiff Smith was an ATDS, and thus Solar Exchange violated the TCPA.

### B. Smith and Heidarpour Were Called By Agents Of Defendant

While Defendant did not place the calls itself, it is vicariously liable for calls placed by its vendors and, in particular, Solar Exchange, to Smith and Heidarpour under common law agency principles. In the Third Circuit, a defendant that is not the initial caller may be held vicariously liable under the TCPA based upon common law agency principles. *Klein v. Com. Energy, Inc.*, 256 F. Supp. 3d 563, 584 (W.D. Pa. 2017). The relationship between the parties is paramount in determining whether there can be vicarious liability. *Richardson v. Verde*, 2016 LEXIS 175642, *11 (E.D. Pa, December 19, 2016). These include agency principles of direct agency, apparent authority and ratification. *Id*.

The Third Circuit has held that "[a]n agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of

---

[7] Mr. Hansen has had his testimony excluded in other matters for making this overreach, which is why he is hesitant to do so anymore. *See, e.g. Keyes v. Ocwen Loan Servicing*, LLC 2018 WL 3914707 (E.D. Mich. 2018) (excluding Hansen's Report because Hansen "impermissibly constructed legal standards and made legal conclusions").

the agent." *Covington v. Int'l Ass'n of Approved Basketball Officials,* 710 F.3d 114, 120 (3d Cir.2013) (internal citations omitted). "Vicarious liability due to an agency relationship can be based on the agent's actual authority. An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Id.* (citing Restatement (Third) of Agency § 2.01 (2006)).

Solar Exchange and the company that called Plaintiff Heidarpour were acting in accordance with Defendant's manifestations and wishes that they place such calls to generate appointments for Defendant. Since 2019, Defendant only obtains its lead for such sales by buying appointments from vendors who conduct telemarketing to generate the leads. Friedman Decl. Ex. 3, Deposition Transcript of Ryan Benko ("Benko Depo.") at 13:1-10; 15:20-16:5, 17:6-19.[8] One such vendor was Solar Exchange. The agreement provides that Solar Exchange would provide "exclusive access to Appointment information" to Defendant and reiterates that Appointments would be provided "on an exclusive basis." Friedman Decl. Ex. 1. Both Smith and Heidarpour experienced the fruits of these relationships when they made an appointment with the vendors which resulted in Defendant summarily appearing at the appointment to sell solar. Defendant cannot outsource its telemarketing to third parties for the purposes of generating appointments and then claim no responsibility as those parties are acting under actual authority to place such calls for the benefit of Defendant. *See, e.g., Dobkin v. Enter. Fin. Grp., Inc.*, No. 2:14-CV-01989 WHW, 2014 WL 4354070, at *4 (D.N.J. Sept. 3, 2014) (finding that there is an actual authority relationship where the defendant outsourced the telesales of its products). Accordingly, Defendant may be held liable for the conduct of its agents in calling

---

[8] All references to the Declaration of Todd Friedman are referring to the declaration in support of the Motion for Class Certification, filed at Dkt. 40.

9

Heidarpour and Smith under direct authority.

An agency relationship is also created when one ratifies the conduct of another. "(1) Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority. (2) A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." *Klein v. Com. Energy, Inc.*, 256 F. Supp. 3d 563, 587 (W.D. Pa. 2017) (citing Restatement (Third) of Agency, § 4.01(b)). § 4.01(b)(2)(b) provides for ratification under circumstances where the conduct justifies a reasonable assumption that the person consents to the act and comment f to that section provides that a "principal may ratify an act by failing to object to it or to repudiate it." *Id.* (citing cmt. f).

Defendant ratified Solar Exchange's calls to Smith by refusing to honor Smith's request not to be called, thus accepting the benefits of further calls to Smith on its behalf. On October 8, 2019, Plaintiff Smith sent a letter to Defendant advising that he had received numerous unwanted telemarketing calls by Defendant or its vendors and asking that Defendant cease. Friedman Decl. at Ex. 4. Defendant responded stating that it purchased contact information and thus would not be able to stop, or make any effort to stop, any third party that placed such calls from placing such calls. *Id.* at Ex. 5. Defendant does not track or even record requests by customers or consumers not to be called. Benko Depo. at 39:21-40:11; 41:1-13. Defendant does not consider complaints at all when deciding whether to continue doing business with a vendor, instead looking only at conversion rates. *Id.* at 57:18-24; 59:12-21. Because it did not honor this request and request that its vendors not call Smith, Smith received 44 calls from Solar Exchange. *Id.* at ¶ 19. Accordingly, Defendant did not object to or repudiate Solar Exchange's calling practices and thus ratified the telemarketing conducted in the Class period.

### C. Courts Have Found Mr. Hansen's Testimony Useful

Mr. Hansen has testified numerously in other matters regarding the nature of the systems used and he has been found to be qualified and reliable for purposes of his expert testimony. The most pointed prior example of this is the case of *Mey v. Venture Data, LLC*, No. 5:14-CV-123, 2017 WL 10398569 (N.D.W. Va. June 6, 2017), in which the defendant challenged Mr. Hansen's qualifications, methodology, and whether his conclusions were legal opinions. The Court found that Mr. Hansen was clearly qualified, having been repeatedly acknowledged for his "expertise regarding dialing system and call record analysis" in other TCPA cases. *Id.* at *3 (citing *Booth v. Appstack, Inc.*, 2015 WL 1466247 (W.D. Wash. Mar. 30, 2015) (granting plaintiff's motion for class certification after Mr. Hansen identified cellular telephone numbers called with an automated dialing system); *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, 2014 WL 3894345, at *1 (S.D. Cal. July 2, 2014) (granting Plaintiff's motion to compel on basis of Mr. Hansen's expert opinions)). The Court further noted that even in *Dominguez v. Yahoo!, Inc.*, 2017 WL 390267, at *19 (E.D. Pa. Jan. 27, 2017) the Court took issue with his "text-messaged-based methodology that Mr. Hansen does not employ here, but unequivocally found that Mr. Hansen was qualified to testify." *Id.* at *3.

As to the issue of making legal conclusions, the Court noted that in *Strauss v. CBE Grp., Inc.,* 2016 WL 2641965, at *2 (S.D. Fla. Mar. 23, 2016), "the court excluded just four sentences from Mr. Hansen's report as improper legal conclusions (none of which appear in this report), but otherwise endorsed his work, holding that "the remainder of [Mr. Hansen's report is] sufficiently reliable and otherwise admissible as expert opinion." *Id.* The Court further noted that in the *Mey* matter, he did not make such ultimate legal conclusions and instead testified that "after analyzing more than twenty documents and relying on his experience with these dialing systems himself,

11

Mr. Hansen summarized his opinion by explaining that the dialing systems used 'have the characteristics of an ATDS, as contemplated by the TCPA and clarified by the FCC.'" *Id.* In this matter, this is exactly how Mr. Hansen has tailored his testimony—testifying that the dialer used by Solar Exchange used a random or sequential number generator to produce numbers and then dial those numbers as set forth in *Duguid*. If Mr. Hansen has testified beyond this to the ultimate legal conclusion, Defendant would seek to strike him for that reason—instead he has testified to the facts that are directly on point for the legal test for an ATDS.

And finally, as to the issue of reliability, the Court in *Mey* dismissed the defendant's attack based on Mr. Hansen not performing a "physical inspection," nothing that "[t]he functionalities of a computer-based dialing system are not based on their physical attributions, and other courts faced with the same argument have summarily rejected the position offered by [defendant]." *Id.* at *4 (citing *Strauss*, 2016 WL 2641965, at *3 ("Although Hansen did not visually inspect the equipment in preparing the Report, he reviewed, among other things, CBE's patent application for the MCA [and] Plaintiff's account notes.... In light of Hansen's familiarity with CBE's dialing systems and review of evidence particular to this case, the Court finds sufficiently reliable Hansen's expert opinion on the technologies CBE used to place the calls at issue."). In this matter, Mr. Hansen reviewed the Call Detail Records, which is an audit of how each call was actually placed by the dialer used by Solar Exchange. Hearing Trans. at 77:2-18. He also reiterated how both the manual and a physical inspection would be pointless, as noted by the Court in *Mey*, because the Call Detail Records demonstrate the functionalities actually used to place the calls at issue. *Id.* at 77:19-78:5. Accordingly, the methodology proposed and used by Mr. Hansen was reliable.

After conducting its analysis, the *Mey* court denied the defendant's motion and then

certified the plaintiff's class claims, noting that "[t]he ATDS issue is subject to uniform expert testimony." *Mey v. Venture Data, LLC*, No. 5:14-CV-123, 2017 WL 10398569, at *14 (N.D.W. Va. June 6, 2017). The Court should so similarly find here and deny Defendant's Motion to Strike and admit Mr. Hansen's uniform testimony regarding the features of the predictive dialer used by Solar Exchange which, in combination with the definition of an ATDS under *Duguid*, demonstrate that the dialer used by Solar Exchange was an ATDS.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant the Motion for Class Certification, certify the Solar Exchange Class under Fed. R. Civ. P. 23(b)(3) and the Prerecord Injunction Class under Fed. R. Civ. P. 23(b)(2), appoint Smith as Class Representative for the Solar Exchange Class and Heidarpour as Class Representative for the Prerecord Injunction Class, and appoint Plaintiffs' attorneys as Class Counsel for both Classes.

Dated: March 15, 2022

By: s/ Thomas E. Wheeler
Thomas E. Wheeler, Esq. (*pro hac vice*)

Filed electronically on this 15th Day of March, 2022, with:

United States District Court CM/ECF system.

Notification sent electronically on this 15th Day of March, 2022, to:

Honorable Michael M. Baylson
United States District Court
Eastern District of Pennsylvania

And All Counsel of Record as Recorded On The Electronic Service List


/s/ Todd M. Friedman, Esq.

TODD M. FRIEDMAN